MAYER | BROWN

Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
United States of America

T: +1 312 782 0600
F: +1 312 701 7711
mayerbrown.com

**Joshua Yount**
T: +1 312 701 8423
F: +1 312 706 8521
JDYount@mayerbrown.com

July 2, 2026

BY ECF

Molly Dwyer
Clerk of Court
U.S. Court of Appeals for the Ninth Circuit
95 Seventh Street
San Francisco, CA 94103

Re: Rule 28(j) Supplemental Authority in *Klawonn v. Board of Directors for the Motion Picture Industry Pension Plans*, Nos. 25-2874 and 25-3230

Dear Ms. Dwyer:

Defendants-Appellees in the above-noted appeals submit the attached supplemental authority relevant to their argument on pages 26-42 of their Second Brief that the undisputed record shows a prudent investment process: *In re Quest Diagnostics ERISA Litigation*, --- F.4th ---, 2026 WL 1783204 (3d Cir. June 22, 2026).

*Quest* involved an ERISA imprudence claim challenging the retention of allegedly underperforming target-date and real-estate funds. 2026 WL 1783204, at *1-2. The Third Circuit affirmed summary judgment for the defendant-fiduciaries because "ERISA is mostly concerned with process, not outcomes," and the fiduciaries followed a sound process by using advisors, meeting fund managers, and evaluating the challenged funds. *Id.* at *1-6. The same is true here: the Committee utilized professional advisors, met fund managers, and made investment decisions after reviewing performance, risk, asset-allocation, and fee information. Second Br. 8-15, 28-30.

*Quest* also held that "short-term underperformance does not prove long-term imprudence." 2026 WL 1783204, at *4. Even if investments underperform, fiduciaries can prudently retain them as long as they "analyze[] that underperformance and evaluate[] the fund's underlying strategy" and find "sound reasons to hold on to the fund during a period of weaker returns." *Id.* Again, the Committee did just that here. Second Br. 9-14, 29-30, 35-40.

Finally, *Quest* rejected an argument that the fiduciaries improperly deferred to their advisors, as the record showed they critically examined recommendations, sought more information, and revised investments. 2026 WL 1783204, at *3-7. That parallels Appellees' showing that the Committee questioned its advisor, probed recommendations, monitored underperformance, and changed investments when appropriate. Second Br. 8-15, 39-41.

Mayer Brown is a global services provider comprising an association of legal practices that are separate entities including Mayer Brown LLP (Illinois, USA), Mayer Brown International LLP (England & Wales), Mayer Brown Hong Kong LLP (a Hong Kong limited liability partnership) and Tauil & Chequer Advogados (a Brazilian law partnership).

*Quest* thus supports Appellees' position that Klawonn's generalized process criticisms and modest underperformance evidence do not create a triable issue on prudence. *See* Second Br. 1-3, 26-41, 45-63.

Sincerely,

/s/ Joshua D. Yount

cc: CM/ECF-registered participants

2026 WL 1783204
Only the Westlaw citation is currently available.
United States Court of Appeals, Third Circuit.

IN RE: QUEST DIAGNOSTICS ERISA LITIGATION
Lawanda Lasha House Johnson, individually & as representative of a class of similarly situated persons, & on behalf of the Profit Sharing Plan of Quest Diagnostics, Inc.; Rebecca A. Rice; Shalamar Curtis, Appellants
v.
Quest Diagnostics Inc.; Profit Sharing Plan of Quest Diagnostics Inc. Benefits Administration Committee; Profit Sharing Plan of Quest Diagnostics Inc. Investment Committee

No. 24-2866
|
Argued: Jan. 28, 2026
|
Filed: June 22, 2026

**Synopsis**
**Background:** Participants in their employer's 401(k) retirement plan brought putative class action against the plan and its managers for allegedly breaching their fiduciary duties under the Employee Retirement Income Security Act (ERISA) by continuing to offer to plan participants two actively managed investment options that either performed worse than passively managed alternatives or underperformed comparable funds. The United States District Court for the District of New Jersey, Julien X. Neals, J., 2024 WL 4285163, granted summary judgment to the plan and managers. Participants appealed.

**Holdings:** The Court of Appeals, Bibas, Circuit Judge, held that:

[1] managers sufficiently reviewed and questioned data from outside investment advisor with respect to actively managed target-date funds;

[2] inquiry managers conducted when they were troubled by underperformance of actively managed mutual fund that primarily held real estate investment trusts supported prudence of the managers' process;

[3] managers were fully aware of how and why their outside investment advisor recommended keeping actively managed target-date funds on menu of investment options for plan participants;

[4] there was no evidence managers were ignorant of their outside investment advisor's methodology with respect to advice it gave regarding actively managed mutual fund;

[5] managers followed accepted practices in managing the plan;

[6] managers satisfied their duty of prudence by following prudent process in continuing to offer to the two actively managed investment options to participants; and

[7] managers did not abuse their discretion under plan's investment policy statements, even if those statements were binding.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

West Headnotes (31)

**[1]** **Federal Courts** Summary judgment
**Federal Courts** Summary judgment
Court of Appeals reviews a grant of summary judgment de novo, viewing facts and drawing inferences in the non-movant' favor.

**[2]** **Labor and Employment** Duties in general
ERISA's rules governing fiduciaries are derived from the common law of trusts, so when ERISA does not speak directly to an issue, courts borrow from trust law. Employee Retirement Income Security Act of 1974 § 2, 29 U.S.C.A. § 1001 et seq.

**[3]** **Labor and Employment** Prudence
Like trustees, ERISA fiduciaries have a continuing duty to monitor investments and

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

remove imprudent ones. Employee Retirement Income Security Act of 1974 § 2, 29 U.S.C.A. § 1001 et seq.

[4] **Labor and Employment** Prudent person standard

ERISA sets out a general standard of prudence for an ERISA fiduciary. Employee Retirement Income Security Act of 1974 § 404, 29 U.S.C.A. § 1104(a)(1)(B).

[5] **Labor and Employment** Prudence

On a claim that an ERISA fiduciary breached the duty of prudence with respect to a plan investment, if the fiduciary's process was prudent, that ends the inquiry and plaintiffs lose. Employee Retirement Income Security Act of 1974 § 404, 29 U.S.C.A. § 1104(a)(1)(B); 29 C.F.R. § 2550.404a-1(b)(1)(i).

[6] **Labor and Employment** Prudence

On a claim that an ERISA fiduciary breached the duty of prudence with respect to a plan investment, if the fiduciary's process was imprudent, a court asks whether a hypothetical prudent investor would have made the same decision anyway; if he would, the plaintiffs lose, but if he would not, plaintiffs might recover. Employee Retirement Income Security Act of 1974 § 404, 29 U.S.C.A. § 1104(a)(1)(B); 29 C.F.R. § 2550.404a-1(b)(1)(i).

[7] **Labor and Employment** Advisors and experts

Merely meeting with an investment advisor and asking some questions does not immunize an ERISA fiduciary from liability breaching the duty of prudence with respect to a plan investment; rather, the fiduciary's interaction with the advisor must be prudent considering the circumstances prevailing when the fiduciary acts. Employee Retirement Income Security Act of 1974 § 404, 29 U.S.C.A. § 1104(a)(1)(B); 29 C.F.R. § 2550.404a-1(b)(1)(i).

[8] **Labor and Employment** Prudence

**Labor and Employment** Advisors and experts

Though the prudence required of an ERISA fiduciary with respect to plan investments is not reducible to a mechanical checklist, three considerations help a court rate a fiduciary's performance: (1) whether the fiduciary reviews their advisors' data and seeks more if needed; (2) whether the fiduciary analyzed and understood the bases for the opinions on which it relied; and (3) whether the fiduciary otherwise used a process that was reasonable under the circumstances. Employee Retirement Income Security Act of 1974 § 404, 29 U.S.C.A. § 1104(a)(1)(B); 29 C.F.R. § 2550.404a-1(b)(1)(i).

[9] **Labor and Employment** Advisors and experts

Managers of 401(k) retirement plan sufficiently reviewed and questioned data from outside investment advisor with respect to actively managed target-date funds, which supported determination that managers followed a prudent process and thus did not breach fiduciary duty of prudence under ERISA by continuing to offer the funds to plan participants; managers met quarterly to review the plan's investment offerings and got annual relevant training, they reflected critically on advisor's concerns about the funds and did due diligence, in that they met with funds' manager, weighed merits of active versus passive funds and funds with different glide paths, and asked advisor to reanalyze target-date fund options, and funds' underperformance was not egregious. Employee Retirement Income Security Act of 1974 § 404, 29 U.S.C.A. § 1104(a)(1)(B); 29 C.F.R. § 2550.404a-1(b)(1)(i).

[10] **Labor and Employment** Prudence

Short-term underperformance of an ERISA-governed plan's investment does not prove long-term imprudence by the plan's fiduciaries; one

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

cannot just point to another investment that has performed better in a five-year snapshot of the lifespan of a fund that is supposed to grow for 50 years to show that fund was an unreasonable investment. Employee Retirement Income Security Act of 1974 § 404, 29 U.S.C.A. § 1104(a)(1)(B); 29 C.F.R. § 2550.404a-1(b)(1)(i).

**[11] Labor and Employment** 🔑 Prudence

So long as an ERISA plan fiduciary analyzes the underperformance of a plan investment and evaluates the investment's underlying strategy, there may be sound reasons to hold on to the investment during a period of weaker returns, and the key question for determining if the fiduciary breached the duty of prudence by holding the investment is whether the fiduciary did that analysis. Employee Retirement Income Security Act of 1974 § 404, 29 U.S.C.A. § 1104(a)(1)(B); 29 C.F.R. § 2550.404a-1(b)(1)(i).

**[12] Labor and Employment** 🔑 Prudence

Even if a plan investment's underperformance alone could ever show that an ERISA fiduciary's process was imprudent, the underperformance would have to be severe and sustained enough to warrant that conclusion. Employee Retirement Income Security Act of 1974 § 404, 29 U.S.C.A. § 1104(a)(1)(B); 29 C.F.R. § 2550.404a-1(b)(1)(i).

**[13] Labor and Employment** 🔑 Prudence

ERISA plan fiduciaries need not pick the best investment to satisfy their duty of prudence. Employee Retirement Income Security Act of 1974 § 404, 29 U.S.C.A. § 1104(a)(1)(B); 29 C.F.R. § 2550.404a-1(b)(1)(i).

**[14] Labor and Employment** 🔑 Advisors and experts

Even if managers of 401(k) retirement plan did not fully discuss outside investment advisor's recommendation to consider switching to better target-date funds, that imperfection would not have violated fiduciary duty of prudence under ERISA through the managers continuing to offer to plan participants actively managed target-date funds. Employee Retirement Income Security Act of 1974 § 404, 29 U.S.C.A. § 1104(a)(1)(B); 29 C.F.R. § 2550.404a-1(b)(1)(i).

**[15] Labor and Employment** 🔑 Prudent person standard

Applying the fiduciary duty of prudence under ERISA is largely a process-based inquiry by a court. Employee Retirement Income Security Act of 1974 § 404, 29 U.S.C.A. § 1104(a)(1)(B); 29 C.F.R. § 2550.404a-1(b)(1)(i).

**[16] Labor and Employment** 🔑 Advisors and experts

ERISA fiduciaries may not simply defer to advisors to satisfy their duty of prudence; they must analyze the bases of advice themselves and look for credible supporting data. Employee Retirement Income Security Act of 1974 § 404, 29 U.S.C.A. § 1104(a)(1)(B); 29 C.F.R. § 2550.404a-1(b)(1)(i).

**[17] Summary Judgment** 🔑 Pension and benefit plans

An isolated email from a representative of actively managed target-date funds, which noted that managers of 401(k) retirement plan did not typically review the representative's materials, was not enough to create a genuine issue of material fact about prudence and defeat summary judgment for the plan and its managers on plan participants' claim they breached their fiduciary duty of prudence under ERISA by continuing to offer the funds to plan participants on plan's menu of investment options. Employee Retirement Income Security Act of 1974 § 404, 29 U.S.C.A. § 1104(a)(1)(B); 29 C.F.R. § 2550.404a-1(b)(1)(i).

**[18] Labor and Employment** 🔑 Prudence

**Labor and Employment** 🔑 Advisors and experts

Inquiry conducted by managers of 401(k) retirement plan when they were troubled by underperformance of actively managed mutual fund that primarily held real estate investment trusts supported prudence of the managers' process, and thus supported determination that the managers did not breach fiduciary duty of prudence under ERISA by continuing to offer the fund to plan participants on plan's menu of investment options; managers put the fund on internal watch list, met with fund's representatives, reviewed fund's performance, and considered alternative real-estate funds, managers later reconsidered the fund, reviewed outside investment advisor's report on global real-estate-fund alternatives, and based on that research, they kept fund on watch list but did not remove it from the menu. Employee Retirement Income Security Act of 1974 § 404, 29 U.S.C.A. § 1104(a)(1)(B); 29 C.F.R. § 2550.404a-1(b)(1)(i).

[19] **Labor and Employment** 🔑 Advisors and experts

Managers of 401(k) retirement plan were fully aware of how and why their outside investment advisor recommended keeping actively managed target-date funds on menu of investment options for plan participants, which supported determination that managers followed prudent process and thus did not breach fiduciary duty of prudence under ERISA by continuing to offer the funds; managers understood the funds' benefits and risks, including that they had underperformed, advisor, despite having some misgivings, liked the impressive resources behind the funds and glide path methodology that continued to adjust allocations after target retirement date, and managers knew that participants typically left their money in the plan after they retired, reducing risks associated with the funds' more aggressive stock allocation. Employee Retirement Income Security Act of 1974 § 404, 29 U.S.C.A. § 1104(a)(1)(B); 29 C.F.R. § 2550.404a-1(b)(1)(i).

[20] **Labor and Employment** 🔑 Advisors and experts

There was no evidence that managers of 401(k) retirement plan were ignorant of their outside investment advisor's methodology with respect to advice it gave regarding actively managed mutual fund that primarily held real estate investment trusts, which supported determination that managers followed prudent process and thus did not breach fiduciary duty of prudence under ERISA by continuing to offer the fund to participants on its menu of investment options; managers understood that the fund was more conservative than some other real-estate funds, which gave the plan downside protection but also caused underperformance during bull markets. Employee Retirement Income Security Act of 1974 § 404, 29 U.S.C.A. § 1104(a)(1)(B); 29 C.F.R. § 2550.404a-1(b)(1)(i).

[21] **Labor and Employment** 🔑 Prudence

**Labor and Employment** 🔑 Advisors and experts

Managers of 401(k) retirement plan followed accepted practices in managing the plan, which supported determination that the managers did not breach fiduciary duty of prudence under ERISA by continuing to offer underperforming funds to plan participants on plan's menu of investment options; in addition to hiring and meeting regularly with an investment advisor, managers repeatedly revised plan's menu, including by replacing several mutual funds and putting funds on a watch list. Employee Retirement Income Security Act of 1974 § 404, 29 U.S.C.A. § 1104(a)(1)(B); 29 C.F.R. § 2550.404a-1(b)(1)(i).

[22] **Summary Judgment** 🔑 Expert Evidence and Affidavits

Expert reports that rest on legally flawed bases cannot defeat summary judgment.

[23] **Labor and Employment** 🔑 Prudence

**Labor and Employment** 🔑 Advisors and experts

Managers of 401(k) retirement plan satisfied their duty of prudence under ERISA by following a prudent process in continuing to offer to plan participants two actively managed investment options that either performed worse than passively managed alternatives or underperformed comparable funds; managers wisely hired an outside advisor but remained actively involved, as they met with fund sponsors and had advisor review specific investments, including the challenged funds. Employee Retirement Income Security Act of 1974 § 404, 29 U.S.C.A. § 1104(a)(1)(B); 29 C.F.R. § 2550.404a-1(b)(1)(i).

[24] **Labor and Employment** 🔑 Investments and Expenditures

Even if ERISA provision providing that fiduciaries must discharge their duties in accordance with documents and instruments governing the plan made 401(k) retirement plan's investment policy statements binding on plan's managers, policy statements gave managers discretion to deviate from them, and managers did not abuse that discretion by continuing to offer to plan participants two actively managed investment options that underperformed; managers considered target-date funds' increased stock allocation and through-retirement glide path, as well as the funds' underperformance, and investigated alternatives, and they also considered alternatives to mutual fund that primarily held real estate investment trusts but had good reason to keep it on menu of investment options because of protection it offered during bear markets. Employee Retirement Income Security Act of 1974 § 404, 29 U.S.C.A. § 1104(a)(1)(D).

[25] **Labor and Employment** 🔑 Standard and scope of review

Trust principles make a deferential standard of review appropriate when an ERISA trustee exercises discretionary powers. Employee Retirement Income Security Act of 1974 § 2, 29 U.S.C.A. § 1001 et seq.

[26] **Labor and Employment** 🔑 Investments and Expenditures

Just as a trustee is not under a duty to make or retain investments that are made merely permissive by trust provision, so too an ERISA fiduciary need not treat a plan's policy statement's permissive language as binding. Employee Retirement Income Security Act of 1974 § 2, 29 U.S.C.A. § 1001 et seq.; Restatement (Third) of Trusts § 91.

[27] **Federal Courts** 🔑 Failure to mention or inadequacy of treatment of error in appellate briefs

An argument raised only in a footnote in a brief is wasted ink, for purposes of appellate review.

[28] **Labor and Employment** 🔑 Prudence

Without a breach of the fiduciary duty of prudence under ERISA, there can be no failure by a fiduciary of the duty to monitor under ERISA. Employee Retirement Income Security Act of 1974 § 2, 29 U.S.C.A. § 1001 et seq.

[29] **Labor and Employment** 🔑 Duties in general

ERISA, like trust law, does not hold trustees liable for poor performance alone. Employee Retirement Income Security Act of 1974 § 2, 29 U.S.C.A. § 1001 et seq.

[30] **Labor and Employment** 🔑 Advisors and experts

A fiduciary is prudent with respect to plan investments, as required by ERISA, if it hires an advisor, critically examines its recommendations and data, and follows up when needed. Employee

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Retirement Income Security Act of 1974 § 404, 29 U.S.C.A. § 1104(a)(1)(B); 29 C.F.R. § 2550.404a-1(b)(1)(i).

[31] **Labor and Employment** Prudent person standard

ERISA mandates prudence from fiduciaries, not perfection. Employee Retirement Income Security Act of 1974 § 404, 29 U.S.C.A. § 1104(a)(1)(B); 29 C.F.R. § 2550.404a-1(b)(1)(i).

On Appeal from the U.S. District Court, D.N.J. Judge Julien X. Neals, No. 2:20-cv-07936

**Attorneys and Law Firms**

Counsel for Appellants, Alec Berin [Argued], James E. Miller, James C. Shah, Miller Shah

Counsel for Appellees, James D. Nelson, Jeremy P. Blumenfeld, Melissa D. Hill [Argued], Gina F. McGuire, Tyler J. Hill, Morgan Lewis & Bockius

Before: Bibas, Porter, and Bove, Circuit Judges

OPINION OF THE COURT

Bibas, Circuit Judge.

***1** Sometimes, even a good process produces disappointing results. Quest Diagnostics offers its employees a 401(k) retirement plan. Plaintiffs, Quest employees who took part in its 401(k) Plan, claim that two of the Plan's investment options were so bad that offering them violated Quest's fiduciary duty under the Employee Retirement Income Security Act (ERISA).

But at summary judgment, their theory falters. Plaintiffs argue that when the Funds failed to meet performance benchmarks, the Plan's managers should have removed those Funds from the available investment options. But ERISA is mostly concerned with process, not outcomes. And the Quest fiduciaries followed a sound process, collaborating with an outside investment advisor and meeting with the managers of the challenged Funds. Nor do fiduciaries need crystal balls. A fund's poor performance alone does not mandate drastic or sudden action. So we will AFFIRM the District Court's summary judgment for Quest.

## I. QUEST'S RETIREMENT FUNDS EARNED SUBPAR RETURNS

Quest Diagnostics provides clinical lab testing and related services. Its employees may contribute to a 401(k) plan to save for retirement. Those plans are defined-contribution retirement plans: Each employee salts away part of his earnings. The plan's managers set a menu of investment options, from which each employee can choose to invest some of his earnings.

Under ERISA, 401(k) plan administrators are fiduciaries of plan participants. *See* 29 U.S.C. § 1104(a). To fulfill its fiduciary duties, Quest's Investment Committee met quarterly and hired two investment advisors, Mercer Investment Consulting and AON Investment Consulting. The Committee also prepared Investment Policy Statements, which set out a framework for judging investments' performance and listed factors that Quest would consider in adding or dropping investment options from its menu. “No single factor” was to be dispositive. App. 5664.

Still, plaintiffs were dissatisfied with the Committee's judgment, pointing to the performance of their Quest 401(k)s. So they filed this class-action lawsuit, accusing the Plan and its managers of breaching their fiduciary duty to the Plan's participants. They challenged the managers' decision to keep offering two investment options: the Fidelity Freedom Funds and the Invesco Global Real Estate Fund. The Invesco Fund is an actively managed mutual fund that primarily holds real estate investment trusts and the like. The Freedom Funds are actively managed target-date funds. (A target-date fund contains a blend of assets that changes over time, becoming more conservative as investors approach and pass the fund's target retirement date. They can be “to-retirement,” meaning designed for retirees to take out their funds at retirement, or “through-retirement,” designed for retirees to stay invested after they stop working.) Each Fund targets a particular retirement date so that investors can choose what fits their goals.

According to plaintiffs, Quest breached its fiduciary duty by keeping the Freedom Funds and Invesco Fund on the Plan's menu of options. They allege that the actively managed

Freedom Funds performed worse than passively managed alternatives, and that the Invesco Fund also underperformed comparable funds. The Freedom Funds were also inherently riskier and allegedly gave managers discretion to over-expose investors to stocks, causing them to underperform passive alternatives during the 2020 stock-market dip. And the Committee's "imprudent choice" to keep offering the Freedom Funds, they allege, was "[e]xacerbat[ed]" by making them the default investment (for investors who did not choose another investment). App. 64 ¶ 30. Separately, plaintiffs claim that the Committee's policy statements obligated it to remove both options from the menu. They also challenged the Freedom Funds' costs below, though they no longer do so.

***2** Plaintiffs' complaint comprised three counts. Count One claimed that, by continuing to offer the Freedom and Invesco Funds, Quest violated its fiduciary duty under 29 U.S.C. § 1104(a). Count Two claimed that the same action violated the fiduciaries' duty to monitor the Plan adequately under §§ 1105(a) and 1109(a). Alternatively, Count Three claimed that even if Quest and its committees were not fiduciaries, they were liable for knowing breach of trust.

**[1]** The District Court denied Quest's motion to dismiss but, after discovery, granted it summary judgment. The court found no breach of fiduciary duty because Quest had hired an investment advisor, actively monitored its investment menu, gotten annual training on its fiduciary duties, and taken follow-up steps about the Freedom and Invesco Funds. Because there was no breach of fiduciary duty, the failure-to-monitor and knowing-breach-of-trust counts likewise failed. We review that holding de novo, viewing facts and drawing inferences in plaintiffs' favor. *Tundo v. County of Passaic*, 923 F.3d 283, 286–87 (3d Cir. 2019).

## II. QUEST DID NOT BREACH ITS ERISA DUTIES

**[2]** **[3]** ERISA's rules governing fiduciaries are "derived from the common law of trusts." *Tibble v. Edison Int'l*, 575 U.S. 523, 528, 135 S.Ct. 1823, 191 L.Ed.2d 795 (2015) (internal quotation marks omitted). So when ERISA does not speak directly to an issue, courts borrow from trust law. *Id.* at 528–29, 135 S.Ct. 1823. Like trustees, ERISA fiduciaries "ha[ve] a continuing duty to monitor ... investments and remove imprudent ones." *Id.* at 529, 135 S.Ct. 1823. Quest does not dispute that it and its committees are ERISA fiduciaries, and it does not invoke ERISA's safe harbor, § 1104(c), to absolve them of fiduciary duties. So the question is whether Quest fulfilled its fiduciary duties under ERISA. It did.

**[4]** ERISA sets out a general standard of prudence. An ERISA fiduciary must "discharge his duties with respect to a plan ... with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." § 1104(a)(1)(B). Department of Labor regulations further define this duty, requiring "appropriate consideration [of] those facts and circumstances that ... the fiduciary knows or should know are relevant to the particular investment," including "the role the investment ... plays" in the plan's overall menu. 29 C.F.R. § 2550.404a-1(b)(1)(i).

The two leading Supreme Court cases on imprudent conduct offer little guidance: Both were on motions to dismiss, both alleged excessive fees, and both were remanded to let lower courts reanalyze prudence anew. *Tibble*, 575 U.S. at 525–26, 531, 135 S.Ct. 1823; *Hughes v. Nw. Univ.*, 595 U.S. 170, 175, 177, 142 S.Ct. 737, 211 L.Ed.2d 558 (2022). Still, *Hughes* did stress that our analysis must be "context specific" and that "courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." 595 U.S. at 177, 142 S.Ct. 737 (internal quotation marks omitted). So "categorical rule[s]" are disfavored. *Id.* at 173, 142 S.Ct. 737.

**[5]** **[6]** Following that guidance, we have separated out two steps: First, if the fiduciary's process was prudent, that ends the inquiry and plaintiffs lose. *See Renfro v. Unisys Corp.*, 671 F.3d 314, 322 (3d Cir. 2011). Second, if the process was imprudent, we ask whether a "hypothetical prudent investor" would have "made the same decision anyway." *Id.* (internal quotation marks omitted). If he would, those plaintiffs lose. *Id.* But if he would not, plaintiffs might recover.

***3** Plaintiffs' breach-of-duty claim fails at the first step because Quest's process was prudent. Their alternative theory of breach (based on the policy statements) also fails. Passing references to an expert opinion and Department of Labor guidance make no difference. And the lack of a breach torpedoes the failure-to-monitor claim as well as the knowing-breach-of-trust claim.

### A. Quest's process was prudent

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

**[7]** Only one of our precedents has considered when summary judgment is proper on a prudence claim for an ERISA fiduciary. In that case, we asked whether the plan's managers had "conduct[ed] an independent investigation into the merits of a particular investment." *In re Unisys Sav. Plan Litig.*, 74 F.3d 420, 435 (3d Cir. 1996). That meant the fiduciaries had "to review the data a consultant gathers, to assess its significance and to supplement it where necessary." *Id.* We also rejected the idea that managers may reflexively rely on financial advice (like credit ratings), noting that reliance may well be imprudent if it is neither "justified [nor] informed." *Id.* at 436; *see also* Restatement (Third) of Trusts § 93, cmt. c (2012) (treating "[r]eliance on relevant professional advice" not as "a complete defense" but as "significant evidence of the prudence of the trustee's action"). Nor does merely meeting with an investment advisor and asking some questions immunize a fiduciary from liability. *See Unisys*, 74 F.3d at 436. Rather, the fiduciary's interaction with the advisor must be prudent considering " the circumstances ... prevailing" when the fiduciary acts. 29 U.S.C. § 1104(a)(1)(B).

**[8]** Though prudence is not reducible to a mechanical checklist, three considerations that informed *Unisys* also help us rate Quest's performance: (1) Did the fiduciaries review their advisors' data and seek more if needed? (2) Did they analyze and understand the bases for the opinions on which they relied? And (3) did they otherwise use a process that was reasonable under the circumstances? Here, Quest did all three.

**[9]** 1. *Quest reviewed its advisor's data and sought more where needed.* Quest's Investment Committee met quarterly to review the funds and got annual relevant training. And it hired Mercer for investment advice, including about the Freedom and Invesco Funds.

*(a) Freedom Funds.* Mercer drafted reports from 2014 to 2016 discussing the Freedom Funds' performance. Though Mercer noted concerns about the underlying funds, it "d[id] not find strong evidence to replace" them. App. 7600.

Quest reflected critically on Mercer's findings. In 2016, the Committee commissioned Mercer to compare the Freedom Funds with alternative target-date funds. Mercer viewed the Freedom Funds positively based on their "[i]mpressive glide path methodology" (meaning how Fidelity changed a fund's investment as it approached its target retirement date) and higher stock allocation (starting in 2014). App. 7583. (Though a higher stock allocation can be risky, it can also yield more gains during bull markets.) It also liked the Funds' "tactical component" that let them "take advantage of value opportunities between asset classes." *Id.* It did not worry about the 2014 change in glide path because models showed that the change gave the Funds "greater upside potential" yet made "[v]irtually no difference in expected and worst case project[ions]" because Quest's participants "tend[ed] to leave their money ... in the target date funds after they retired." App. 7600 (first two quotations), 5895 (third one). This made sense. The Funds gave participants a higher exposure to equities (more upside). And the risks posed by the higher stock allocation—particularly the risk that stock prices fell close to a participant's retirement date—were mitigated by the participants' tendency not to draw from their retirement savings right when they left the workforce. In Mercer's (and the Committee's) view, that tendency reduced the risk of the Funds' more aggressive stock allocation even as participants approached retirement.

***4** The Committee did more due diligence than that. It met with Fidelity (the Funds' manager) to discuss the Freedom Funds. It weighed the merits of active versus passive funds and funds with different glide paths. And in 2019, it asked Mercer to reanalyze target-date fund options. It did not mindlessly follow Mercer, but did its own homework.

Even so, plaintiffs retort that Quest was too slow to react. They stress that the Freedom Funds underperformed from 2013 through 2015 and changed their glide path in 2014. Their complaint compared the Freedom Funds with passively managed funds, which performed better during that same time. But as two other circuit decisions—one of which was about the same Freedom Funds, litigated by the same plaintiffs' firm—explained, active and passive index funds are "apples and oranges." *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1166 (6th Cir. 2022) (Sutton, C.J.). The two types of funds are not materially identical investments and are not fungible; instead, they reflect two different investment strategies. *Id.*; *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 & n.2 (8th Cir. 2018). Perhaps because the argument failed elsewhere, plaintiffs abandoned that inapt comparison to passive index funds at summary judgment and on appeal. Now they argue that the Freedom Funds were ranked in the bottom half of target-date funds from mid-2013 through mid-2014, so they were a bad choice in and of themselves.

**[10]** **[11]** **[12]** But short-term underperformance does not prove long-term imprudence. One cannot just "point[ ] to another investment that has performed better in a five-year

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

snapshot of the lifespan of a fund that is supposed to grow for fifty years" to show that fund was an unreasonable investment. *Smith*, 37 F.4th at 1166, *quoted with approval in Pizarro v. Home Depot, Inc.*, 111 F.4th 1165, 1180 (11th Cir. 2024). So long as a plan fiduciary analyzes that underperformance and evaluates the fund's underlying strategy, there may be sound reasons to hold on to the fund during a period of weaker returns. The key question is whether the fiduciary did that analysis. Even if an investment's underperformance alone could ever show that a fiduciary's process was imprudent, the underperformance would have to be severe and sustained enough to warrant that conclusion.

**[13]** Here, the Funds' underperformance was hardly egregious. As of mid-2014, six of the thirteen Freedom Funds matched or outperformed their benchmarks over three years. By the end of 2014, the Funds ranked at the median among target-date funds. And from mid-2014 through late 2015, almost all of them out-performed or matched their indices across at least one timespan. So it was not obvious that they were bad investments. Minor underperformance, like that in 2013 and 2014, does not demand immediate change, especially when the goal is long-term growth. Plaintiffs are right that there were probably "other investment options in the same asset class as the Freedom Funds that had better prospects." Appellants' Br. 36. But again, pointing to other, stronger options is not enough—ERISA fiduciaries need not pick the best investment to satisfy their duty of prudence. *See Smith*, 37 F.4th at 1166. Requiring fiduciaries to cut every below-average fund would create chaos.

**[14]** **[15]** **[16]** Rather, we must scrutinize the Committee's *process*, because applying the duty of prudence is "largely a process-based inquiry." *Id.*; *accord Sweda v. Univ. of Pa.*, 923 F.3d 320, 329 (3d Cir. 2019), *abrogated in part by Hughes*, 595 U.S. at 170, 142 S.Ct. 737. Plaintiffs hammer Quest's failure to heed Mercer, but to no avail. Even if the Committee did not fully discuss Mercer's recommendation to consider switching to better target-date funds, that imperfection would not be enough to show imprudence. Plus, under *Unisys*, blindly following Mercer's view might itself violate the Committee's fiduciary duties. Fiduciaries may not simply defer to advisors; they must analyze the bases of advice themselves and look for credible supporting data. *Unisys*, 74 F.3d at 435–36. Moreover, Mercer never recommended removing the Funds; it just recommended investigating them, and Quest did that.

***5** **[17]** Finally, plaintiffs dredge up an isolated email from a Fidelity representative noting that "the committee does not typically review my materials." App. 5868. Though that is a bad fact for Quest, it is just "a scintilla of evidence," not enough to create a genuine issue of material fact about prudence and defeat summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In short, the Committee did enough to review and question the Freedom Funds data prepared by its advisor.

**[18]** *(b) Invesco Fund.* Quest likewise did enough to scrutinize the Invesco Fund. Because the Committee was troubled by its underperformance, in 2017 it put that Fund on an internal watch list. Then it met with Invesco's representatives, reviewed the Fund's performance, and considered alternative real-estate funds. After doing that factfinding, the Committee retained that Fund. In 2019, the Committee reconsidered that Fund, reviewing Mercer's report on global real-estate-fund alternatives. Based on Mercer's research, it kept that Fund on the watch list but did not remove it from the menu. In short, Quest's inquiry supports the prudence of its process.

2. *Quest understood Mercer's methodology and the bases underlying its opinions.* A second question from *Unisys* asks whether Quest knew that Mercer's recommendations were "supported" by "credible data" when they took those recommendations. 74 F.3d at 435–36. They were, and Quest knew it. Unlike the imprudent fiduciary in *Unisys*, Quest could articulate why the opinions that it relied on made sense.

**[19]** *(a) Freedom Funds.* Quest understood the Freedom Funds' benefits and risks. The Committee knew that Fidelity had changed their glide path and that they had underperformed. In its 2016 presentation, Mercer explained to Quest why it recommended keeping the Funds despite those issues. Even though it had misgivings about "the quality of the underlying funds," Mercer liked Fidelity's "[i]mpressive resources" and glide path methodology that continued to adjust allocations after the target retirement date. App. 7600. Quest knew that its participants typically left their money in the Plan after they retired, reducing the risks associated with the Funds' more aggressive stock allocation. So Quest was fully aware of how and why Mercer recommended keeping the Freedom Funds.

**[20]** *(b) Invesco Fund.* There is no real evidence that Quest was ignorant of Mercer's methodology. The Committee understood that the Invesco Fund was more conservative

than some other real-estate funds, giving the Plan "downside protection" but also causing underperformance during bull markets. App. 6749. True, two committee members could not recall the methodology's specifics at their depositions. *Cf. Unisys*, 74 F.3d at 435 (requiring further consideration when the fiduciaries could not remember whether it considered a critical issue). But those depositions came six to eight years after the fact. That natural forgetfulness is not enough to create a genuine issue of material fact about whether the Committee collectively understood Mercer's methodology at the time.

**[21]** 3. *Quest otherwise followed generally accepted practices of plan management.* In addition to hiring and meeting regularly with an investment advisor, the Committee repeatedly revised the Plan's menu. In 2014, it replaced one fund with a less expensive one and put another on a watch list. In 2016, it changed money-market funds. In 2017, as discussed, it put the Invesco Fund on a watch list. And in 2018, it replaced several mutual funds and put one on the watch list. Each of these actions shows that the Committee was following accepted practices in managing the Plan.

***6** **[22]** Resisting this conclusion, plaintiffs cite their expert (Driscoll)'s report. Although an expert report can provide evidence of imprudence, this report fails. Driscoll argues (like plaintiffs here) that the Funds had to be removed because they had underperformed over the short term. Yet we have explained why that is wrong on the law, and expert reports that rest on legally flawed bases cannot defeat summary judgment. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242–43, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993). And Driscoll nowhere rebuts the main reason the Committee kept the Invesco Fund: as "downside protection." App. 6749.

* * *

**[23]** Quest's process was sound. The Committee wisely hired an outside advisor but remained actively involved, meeting with fund sponsors and having Mercer review specific investments, including the challenged Funds. The Committee did its duty, following a prudent process.

### B. Quest properly considered the policy statements' non-binding factors

**[24]** Not so fast, plaintiffs say. ERISA fiduciaries must "discharge [their] duties ... in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with" ERISA. 29 U.S.C. § 1104(a)(1)(D). Plaintiffs claim that this provision makes the Plan's Investment Policy Statements binding.

That argument is novel in this circuit. We have never held that violating a policy statement breaches a fiduciary duty. Plaintiffs cite cases from two other circuits that supposedly did. Appellants' Br. 28 (citing *Cal. Ironworkers Field Pension Tr. v. Loomis Sayles & Co.*, 259 F.3d 1036, 1042 (9th Cir. 2001) & *Dardaganis v. Grace Cap. Inc.*, 889 F.2d 1237, 1241–42 (2d Cir. 1989)). But the Ninth Circuit did not reach the question, for it affirmed a district-court finding that the fiduciaries had *not* violated the plan's guidelines. 259 F.3d at 1043. And even if the Second Circuit allows it, another circuit has expressly doubted that these policy statements are binding. *See Tussey v. ABB, Inc.*, 746 F.3d 327, 334 n.5 (8th Cir. 2014). But we need not decide the question. Even if Quest's policy statements are covered by § 1104(a)(1)(D), they gave the Committee discretion to deviate from them, so Quest never violated them.

The policy statements were full of permissive language. For instance, they provided that the Committee "may" place an investment on a watch list or remove it from the menu. App. 5667. And though they listed "common factors that may cause the Investment Committee to lose confidence in a fund," they also underscored that "[n]o single factor" is dispositive. App. 5664, 5667.

**[25]** **[26]** Though we have no law directly on point, background principles of trust law favor deferring to trustees' judgment calls. "Trust principles make a deferential standard of review appropriate when a[n ERISA] trustee exercises discretionary powers." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 111, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). True, *Firestone* addressed a plan's benefit-eligibility determinations and ultimately found the policy documents there did not grant discretion. *See id.* But the rationale just quoted fits well here. Just as a "trustee is not under a duty to make or retain investments that are made merely permissive by trust provision," so too an ERISA fiduciary need not treat a policy statement's permissive language as binding. Restatement (Third) of Trusts § 91, cmt. f (2007).

"[W]here discretion is conferred upon the trustee with respect to the exercise of a power," as here, "its exercise is not subject to control by the court except to prevent an abuse by the trustee of his discretion." *Firestone*, 489 U.S. at 111, 109 S.Ct. 948 (quoting Restatement (Second) of Trusts § 187

(1959)). We see no abuse of discretion here. The Committee considered the Freedom Funds' increased stock allocation and through-retirement glide path. It also considered the Freedom Funds' underperformance and alternatives, investigating active versus passive index funds as well as funds with various glide paths. It likewise considered alternatives to the Invesco Fund but had a good reason to keep it on the menu because of the protection it offered during bear markets. Quest did not abuse its discretion.

**C. We need not address two other issues**

***7 [27]** Plaintiffs' expert (Driscoll) argues that because the Freedom Funds are the default investments, the Plan should have paid closer attention to them. But plaintiffs' opening brief does not raise this as a standalone argument, mentioning it only in passing while making other arguments. Plaintiffs also drop a footnote discussing other Department of Labor guidance about target-date funds. Yet an argument raised only in a footnote is wasted ink. *In re: Asbestos Prods. Liab. Litig. (No. VI)*, 873 F.3d 232, 237 (3d Cir. 2017). And even plaintiffs' expert acknowledges that this guidance does not bind plan managers.

**D. Plaintiffs' two other claims fail also**

**[28]** As the District Court noted, without a breach of the duty of prudence, there can be no failure to monitor. *See Mator v. Wesco Distrib., Inc.*, 102 F.4th 172, 191 (3d Cir. 2024). And Count Three is a fallback claim in case any of the defendants is not an ERISA fiduciary. But no one disputes that Quest and its committees are fiduciaries, plus this claim also fails because there was no breach of the duty of prudence. So all three counts stand or fall together. Because we will affirm the summary judgment for Quest on Count One, we will also affirm it on Counts Two and Three.

* * * * *

**[29] [30] [31]** ERISA, like trust law, does not hold trustees liable for poor performance alone. Courts review process first. A fiduciary is prudent if it hires an advisor, critically examines its recommendations and data, and follows up when needed. Quest did just that. Even if the Funds kept on its menu were not the best, they were not the worst either, and the Committee's process was sensible. Because ERISA mandates prudence, not perfection, we will AFFIRM.

**All Citations**

--- F.4th ----, 2026 WL 1783204

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.